# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KEVIN J. EGHBALI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HUEL INC.<br><br>Defendant. | Case No. 1:25-cv-5949<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kevin J. Eghbali (hereinafter "Plaintiff"), individually and on behalf of himself and all others similarly situated, brings this class action lawsuit against Defendant Huel Inc. ("Huel" or "Defendant") based upon personal knowledge as to himself, the investigation of his counsel, and on information and belief as to all other matters.

## NATURE OF THE ACTION

1.     This is a class action lawsuit against Defendant regarding the manufacture, distribution, and sale of its Huel Black Edition Protein Powder ("Affected Product"), the marketing and labeling of which are silent as to the presence of elevated lead and cadmium levels.  In truth, the Affected Product contains unsafe levels of lead and cadmium (collectively "Heavy Metals"), and Huel's advertising and packaging are false, misleading, and reasonably likely to deceive the public.

2.     Defendant does not represent or warn consumers that the Affected Product contains lead and cadmium.

1

3.      Lead is a harmful chemical when consumed and is especially dangerous to pregnant women and children. Lead poisoning occurs when lead builds up in the body over months or years.[1]

4.      Any amount of lead exposure can lead to serious health problems. Children younger than 6 years old are especially vulnerable to mild lead exposure, which can severely affect mental and physical development.[2] At very high levels, lead poisoning can be fatal in adults and children.[3]

5.      Cadmium is also dangerous when consumed. Cadmium can be found in cigarette smoke and a wide variety of industrial products, including batteries, pigments, metal coatings, and plastics. Cadmium is carcinogenic, and exposure to even low levels of cadmium over time may result in a toxic build-up of cadmium in the kidneys, leading to kidney disease[4] and bone damage and osteoporosis.[5]

6.      Consumer Reports Magazine discovered that a selection of popular protein powders sold to the public contained high levels of heavy metals: specifically, cadmium and lead.[6]

7.      Included among the brands selling protein powders with elevated cadmium and lead was Huel's Protein Powder.[7]

---

[1] *Lead poisoning*, MAYO CLINIC, (Jan 21, 2022) https://www.mayoclinic.org/diseases-conditions/lead-poisoning/symptoms-causes/syc-20354717 (last visited October 23, 2025).
[2] *Id.*
[3] *Id.*
[4] Nikhil Johri, *Heavy Metal Poisoning: The Effects of Cadmium on the Kidney,* NIH (Oct. 23, 2010) https://pubmed.ncbi.nlm.nih.gov/20354761/ (last visited October 23, 2025).
[5] Agneta Akesson et al.*, Cadmium-Induced Effects on Bone Population-Based Study of Women*, NIH (Feb. 2, 2006) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1480481/ (last visited October 23, 2025).
[6] Paris Martineau, *Protein Powders and Shakes Contain High Levels of Lead*, CONSUMER REPORTS (Updated October 15, 2025) https://www.consumerreports.org/lead/protein-powders-and-shakes-contain-high-levels-of-lead-a4206364640/ (last visited October 23, 2025).
[7] *Id.*

8.      Huel claims and promotes that its ingredients undergo testing and that the company is confident in the current formulation and safety of the products. As a part of its commitment to food safety, Huel makes safety claims on its website:

So, is Huel safe?

Yes. Independent testing confirms that lead and other trace minerals in Huel are far below global safety thresholds, including FDA, NSF, and EU/UK limits. Every batch is tested by accredited labs to ensure full compliance and transparency."[8]

9.      Huel notes that its production facilities have certified management systems in place for food safety and follow strict requirements. Huel states that its results compare to global standards: "Lead levels in Huel Black Edition (1.5–2.2 µg per serving) are consistent with what's found in everyday meals and meet all international safety benchmarks.[9]

10.      Huel claims on its website that it "go[es] above and beyond by testing Huel for hundreds of contaminants and banned substances."[10] Huel also claims that "All Huel products are routinely tested for micro, allergens, heavy metals, and pesticides."[11]

11.      In November of 1986, California passed the Safe Drinking Water and Toxic Enforcement Act, which came to be known by its legislative name "Prop 65." Proposition 65 requires businesses to provide warnings to Californians about significant exposures to chemicals that cause cancer, birth defects, or other reproductive harm.[12] As a part of that standard, California's experts set regulatory standards for acceptable levels of exposure to toxic chemicals,

---

[8] *So, is Huel safe?, Heavy Metals in Huel – What You Need to Know*, HUEL, https://huel.com/pages/heavy-metals-in-protein-powders (last visited October 23, 2025).
[9] *Id.*
[10] *Our Quality and Testing*, HUEL, https://huel.com/pages/quality-standards (last visited October 23, 2025).
[11] *Third Party Testing*, HUEL, https://huel.com/pages/quality-standards (last visited October 23, 2025).
[12] *About Proposition 65*, CALIFORNIA OFFICE OF ENVIRONMENTAL HEALTH HAZARD ASSESSMENT, https://oehha.ca.gov/proposition-65/about-proposition-65 (last visited October 23, 2025).

referred to as the maximum allowable dose levels ("MADLs") in chemicals that are identified as causing cancer, birth defects, or reproductive harm.[13]

12.     Consumer Reports referenced California's MADLs for lead (0.5 Micrograms) and cadmium (4.1mcg). The testing found that one serving of Huel's Black Edition powder contained 6.3 micrograms of lead, or about 1,290 percent of Consumer Reports' daily lead limit.[14]

13.     Defendant knew or should have known that its representations and advertisements regarding the Affected Product were false and misleading and that they failed to disclose material information. Defendant had been notified by previous cadmium exposure notices on September 23, 2021, September 30, 2021, October 7, 2021, and October 22, 2021, served by Environmental Research Center, Inc. (ERC), which filed Proposition 65 Notices for elevated lead and cadmium levels found in the products of multiple Huel products.[15]

14.     The lead and cadmium levels in the Affected Product could not have been known before purchasing them and could not be determined without extensive and expensive scientific testing. Accordingly, consumers relied, and continue to rely, on Defendant to be truthful regarding the ingredients, including the presence of the Heavy Metals, in the Affected Product.

15.     Defendant, on the other hand, is positioned to test its products and has exclusive knowledge of the quality control testing on the Affected Product and the ingredients contained therein.

16.     If Plaintiff knew that the Affected Product contained the Heavy Metals, he would not have purchased the Affected Product on the same terms, if at all.

---

[13] *The mysterious world of Prop 65, part 8: Acceptable risk levels*, CONSUMER PRODUCTS LAW BLOG (Feb. 19, 2015) https://www.consumerproductslawblog.com/2015/02/the-mysterious-world-of-prop-65-part-8-acceptable-risk-levels/ (last visited October 23, 2025).
[14] Paris Martineau, *Protein Powders and Shakes Contain High Levels of Lead* (last visited October 23, 2025).
[15]*Huel, inc.*, ENVIRONMENTAL RESEARCH CENTER, (Sep 24, 2021) https://www.erc501c3.org/settlements/rsogim9gteqn82puv6r82vfbo34ckt (last visited October 23, 2025).

17.    Plaintiff and those similarly situated ("Class Members") relied on Defendant's misrepresentations and omissions that the Affected Product contained only those ingredients listed on the Affected Product's packaging and labeling.

18.    Plaintiff and Class Members paid a premium for the Affected Product based upon Defendant's marketing and advertising campaign. Given that Plaintiff and Class Members paid a premium for the Affected Product based on Defendant's misrepresentations and omissions, Plaintiff and Class Members suffered an injury in the amount of the premium paid.

19.    Defendant's conduct violated and continues to violate, inter alia, California's Unfair Competition Law ("UCL") California Business & Professional Code § 17200 et seq., violation of California's False Advertising Law ("FAL") California Business & Professional Code § 17500 et seq., and violations of New York General Business Law ("GBL) NY CLS Gen Bus §§ 349-350. Defendant also breached and continues to breach its warranties regarding the Affected Product and has been and continues to be unjustly enriched. Accordingly, Plaintiff brings this action against Defendant on behalf of himself and Class Members who purchased the Affected Product during the applicable statute of limitations period (the "Class Period").

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class member is a citizen of a state different from the Defendant.

21.    This Court has personal jurisdiction over Defendant because Defendant conducts a substantial part of its business regularly and continuously within New York, and Defendant is a citizen of New York

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District, and Defendant transacts substantial business in this District and is headquartered in this District.

## PARTIES

23.    Plaintiff Kevin J Eghbali is a citizen of California. Plaintiff purchased the Affected Product during the Class Period in California. Prior to purchasing the Affected Products, Plaintiff purchased the Affected Product in reliance on Defendant's representation that the Affected Product contained only the ingredients listed on the Affected Product's packaging and were safe for consumption. Plaintiff believed that the Affected Product did not contain lead and cadmium.

24.    Defendant Huel Inc. is a citizen of New York. As part of its broader business, Defendant manufactures, advertises, labels, and sells protein powders, including the Affected Product, throughout the United States. Defendant created or authorized the creation and dissemination of the deceptive advertisements, packaging, and labeling associated with the Affected Product.

## FACTUAL ALLEGATIONS

25.    Consumers must and do rely on Defendant to truthfully and honestly report what its Affected Product contains on its packaging or labels. Companies, including Huel as alleged herein, profit from consumers' search for safe and healthy products. Consumers will, and do, pay premiums for safe and healthy products.

26.    While Defendant's marketing and labeling of the Affected Product is silent as to the levels of cadmium and lead present in the Affected Product, public reports and articles recently revealed that Defendant's Affected Product contains unsafe levels of lead and cadmium. The levels

of lead and cadmium observed exceeded the MADLs for these chemicals, posing serious health risks.

27.    Lead and cadmium are heavy metals, and their presence in food, alone or combined, poses a serious safety risk to consumers because they can cause cancer and other serious problems (often irreversible), such as damage to brain development, the liver, kidneys, and bones.[16]

28.    California recognized that lead and cadmium as "known to the state to cause cancer or reproductive toxicity . . ." after the state's qualified experts formed the opinion that both lead[17] and cadmium[18] were "shown through scientifically valid testing according to generally accepted principles to cause cancer or reproductive toxicity."[19]

29.    The harmful effects of lead have been studied extensively, particularly its effect on children. Studies have shown that even lower levels of lead exposure in children may result in reduced neurobehavioral functioning, with symptoms ranging from neuropsychological deficits that interfere with classroom performance, lower IQ, decreased verbal processing, and attention span.[20]

30.    Lead can also cross the fetal barrier during pregnancy, exposing the developing fetus and mother to risks in the form of reduced growth and premature birth.[21]

---

[16] Prabhat Kumar Rai, et al., *Heavy metals in food crops: Health risks, fate, mechanisms, and management*, SCIENCEDIRECT, Vol. 125 (Apr. 2019) https://www.sciencedirect.com/science/article/pii/S0160412018327971 (last visited October 23, 2025).
[17] *Lead and Lead Compounds*, CALIFORNIA OFFICE OF ENVIRONMENTAL HEALTH HAZARD ASSESSMENT, (Oct. 01, 1992) https://oehha.ca.gov/proposition-65/chemicals/lead-and-lead-compounds (last visited October 23, 2025).
[18]    *Cadmium*, CALIFORNIA OFFICE OF ENVIRONMENTAL HEALTH HAZARD ASSESSMENT, https://oehha.ca.gov/proposition-65/chemicals/cadmium (last visited October 23, 2025).
[19] *See* Cal. Health & Safety Code § 25249.8(b).
[20] Theodore I. Lidsky and Jay S. Schneider, *Lead neurotoxicity in children: basic mechanisms and clinical correlates*, OXFORD ACADEMIC, Vol. 126, Issue 1 (Jan. 1, 2003) https://academic.oup.com/brain/article/126/1/5/299373#.Y79duQG8eOc.link (last visited October 23, 2025).
[21] *See Childhood Lead Poisoning Prevention: Risk Factors and Pregnancy* , U.S. CENTERS FOR DISEASE CONTROL AND PREVENTION, (Mar. 13, 2025) https://www.cdc.gov/nceh/lead/prevention/pregnant.htm (last visited October 23, 2025).

31.     More generally, lead may cause anemia, weakness, as well as kidney and brain damage.[22] In fact, lead accumulates over time and may affect almost every organ and system in a person's body, leading to toxicity and serious health risks, including inhibited neurological function, anemia, seizures, and, at worst, coma and death.[23]

32.     Adults are also affected by lead toxicity, as the bones can store lead after initial exposure and re-expose the body by releasing the stored lead into the bloodstream.[24]

33.     Because the negative effects of lead can be experienced below established limits, "[n]o amount of lead is known to be safe."[25]

34.     Cadmium, a heavy metal-like lead, also poses severe safety concerns for consumers.

35.     Like lead, cadmium may cause complications in pregnant women, such as fetal growth restriction.[26]

36.     The World Health Organization classified cadmium as a Group 1 carcinogen in 2012,[27] and its exposure is known to cause a variety of cancers.[28] The U.S. Centers for Disease

---

[22] *The National Institute for Occupational Safety and Health (NIOSH): Lead*, U.S. CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/niosh/lead/index.html (last visited October 23, 2025).

[23] *Id.*

[24] See *Lead Exposure in Adults: A Guide for Health Care Providers*, STATE OF NEW YORK DEPARTMENT OF HEALTH, https://www.health.ny.gov/publications/2584.pdf  (last visited October 23, 2025).

[25] Jessica Pupovac, *Lead Levels Below EPA Limits Can Still Impact Your Health*, NPR (Aug. 13, 2016 8:41 AM ET), https://www.npr.org/sections/thetwo-way/2016/08/13/489825051/lead-levels-below-epa-limits-can-still-impact-your-health (last visited October 23, 2025).

[26] Hui-Xia Geng and Lai Wang, *Cadmium: Toxic Effects on Placental And Embryonic Development*, NIH (Feb. 15, 2019) https://pubmed.ncbi.nlm.nih.gov/30797179/ (last visited October 23, 2025)

[27] *IARC Monographs on the Identification of Carcinogenic Hazards to Humans: List of Classifications*, INTERNATIONAL AGENCY FOR RESEARCH ON CANCER – WORLD HEALTH ORGANIZATION, https://monographs.iarc.who.int/list-of-classifications (last visited October 23, 2025).

[28] *National Cancer Institute Cancer Trends Progress Report: Cadmium*, NIH, https://progressreport.cancer.gov/prevention/cadmium#:~:text=Cadmium%20and%20its%20compounds%20are,the%20breast%20and%20urinary%20bladder. (last visited October 23, 2025).

Control concurs with the World Health Organization and similarly considers cadmium to be a cancer-causing agent.[29]

37.      When eaten, large amounts of cadmium can severely irritate the stomach and cause vomiting and diarrhea.[30] Even at low exposure levels, cadmium can build up in the kidneys and cause kidney disease and fragile bones.[31]

38.      Consumers lack the meaningful ability to test or independently discover whether a product contains unhealthy substances such as lead, cadmium, or other unsafe substances, especially at the point of sale. The testing necessary to discover many unhealthy substances, including cadmium and lead, requires expensive and destructive scientific testing. Given the relatively low price of the Affected Product, no reasonable consumer would engage in such testing before purchasing the Affected Product.

39.      Consumers must instead rely on Defendant to truthfully represent what its Affected Product contains on its packaging and labels. Where Defendant was silent as to the presence of the Heavy Metals, consumers, including Plaintiff and Class Members, did rely on Defendant's representations that the Heavy Metals were not present in the Affected Product.

40.      However, public reports and articles recently revealed that Defendant's Affected Product contains unsafe levels of lead and cadmium. The levels of lead and cadmium observed exceeded the MADLs for these chemicals, posing serious health risks. Despite these risks, Defendant failed to include any disclosures regarding lead and cadmium levels on its Affected Product.

---

[29] *Cadmium- ToxFAQs,* AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY (Oct. 2012) *https://www.atsdr.cdc.gov/toxfaqs/tfacts5.pdf* (last accessed October 23, 2025). ("DHHS and IARC have determined that cadmium and cadmium compounds are human carcinogens." (CDC houses ATSDR; this is the CDC's public-health statement on cadmium's carcinogenicity.))
[30] *Id.*
[31] *Id.*

41.    Defendant knew and/or should have known of the lead and cadmium in the Affected Product. Recently this year, as per an investigation conducted by the Consumer Reports, it found measurable levels of cadmium and inorganic arsenic in some products. One serving of Huel's Black Edition plant-based protein powder contains 9.2 micrograms of cadmium, more than double the level that public health authorities and Consumer Reports experts say may be harmful to have daily, which is 4.1 micrograms.[32] This investigation was based on levels as per the California Prop 65 maximum allowable dose level (MADL) for lead — 0.5 micrograms per day — which has a wide safety margin built in.[33] Consumer Reports contacted the manufacturers of all 23 products it tested, and shared with them the results and methodology, wherein Huel did not respond to questions about the amount of cadmium found in its product, failing to warn consumers that the Affected Product would expose consumers to cadmium and lead when eaten.

42.    Independent testing reported by Consumer Reports found that one serving of the Affected Product contained 6.3 µg lead and 9.2 µg cadmium, levels that exceed Consumer Reports' daily level of concern and, for lead, are likely to exceed the FDA's interim reference level for adults when considered alongside typical dietary exposure.[34]

43.    Researchers have found that products made with plant-based proteins generally tested higher for lead than those using meat- or dairy-based sources."[35] Extracting concentrated protein from plants is a complex, highly mechanized process. With every additional step, there's

---

[32] Paris Martineau, *Protein Powders and Shakes Contain High Levels of Lead*, (last visited October 23, 2025).

[33] See Ellison Folk, *Notice of Violation of California Health and Safety Code § 25249.5 et seq.*, OFFICE OF THE ATTORNEY GENERAL – STATE OF CALIFORNIA DEPARTMENT OF JUSTICE (Oct. 24, 2017) https://oag.ca.gov/system/files/prop65/notices/2017-02379.pdf (last visited October 23, 2025).

[34] Kevin Loria, *Lead And Cadmium Could Be In Your Dark Chocolate*, CONSUMER REPORTS (Updated Oct. 25, 2023) https://www.consumerreports.org/health/food-safety/lead-and-cadmium-in-dark-chocolate-a8480295550/ (last visited October 23, 2025).

[35] Kevin Loria, *Lead And Cadmium Could Be In Your Dark Chocolate*, CONSUMER REPORTS (Updated Oct. 25, 2023) https://www.consumerreports.org/health/food-safety/lead-and-cadmium-in-dark-chocolate-a8480295550/ (last visited October 23, 2025).

a chance of introducing contaminants such as lead.[36] Consumer Reports and its researchers concluded that lead could enter pea protein at the manufacturing plant when the dried peas are dehulled and ground into flour, depending on the type of machines and metals used. Lead could also be introduced during the process where the flour is mixed with water to separate the protein from the starch and fiber, if the water wasn't tested for contamination. The final step of the process, where the protein is coagulated with food-grade acid, neutralized, and spray-dried into the powder found in many foods and supplements, also offers opportunities for contamination, depending on the materials used."[37] Thus, on information and belief, Huel itself is responsible for lead being present in the Affected Product.

44.    Additionally, Defendant has a responsibility to implement controls to significantly minimize or prevent unnecessary consumer exposure to the Heavy Metals in the Affected Product. Huel says that its ingredients undergo "rigorous testing" and that the company is "confident in the current formulation and safety of the products, which is well within the levels set out by NSF."[38]

45.    While Defendant tells its customers about its testing practices and transparency for its nutritional information, it does not speak as to how it determines whether or not it complies with its own promise to "The highest quality standards, guaranteeing you top-notch nutrition."[39] Accordingly, Defendant was in the best position to test the Affected Product for lead and cadmium levels. Defendant represented that it complied with all relevant laws, and sold the Affected Product containing the Heavy Metals, whereas Plaintiff and the Class could not have known or easily discovered that the Affected Product posed a health hazard.

---

[36] *Id*
[37] *Id.*
[38] Paris Martineau, *Protein Powders and Shakes Contain High Levels of Lead*, (last visited October 23, 2025).
[39] *Huel could change your life. Here's why.* HUEL, https://huel.com/pages/why-huel  (last visited October 23, 2025).

46.     Defendant represents that the Affected Product is safe and subject to rigorous, batch-level contaminant testing and that it complies with global safety thresholds. These representations were deceptive in that they omitted material information: independent testing reported elevated lead and cadmium, and a single daily serving would reasonably be expected to exceed FDA's interim adult lead reference level. A reasonable consumer would deem this information material.

47.     Despite Defendant's knowledge of lead and cadmium in the Affected Product, Defendant failed to provide any warning on the place that every consumer looks when purchasing a product –the packaging or labels — that the Affected Product contains lead and cadmium.

48.     Consumers are concerned with what is in the food that they are putting into their bodies, and that concern is amplified when providing food for particularly susceptible consumers, such as pregnant women and children.

49.     In making their purchasing decisions, consumers, such as Plaintiff and the Class Members, are influenced by the ingredients listed, as well as any warnings (or lack thereof) on the packaging of food they purchase. Defendant knew or should have known that if it had not omitted that the Affected Product contained unsafe levels of lead and cadmium and that the Affected Product was not safe or healthy for consumption, then Plaintiff and the Class would not have paid a premium for the Affected Product or purchased it at all.

50.     Plaintiff and the Class reasonably relied on the marketing, labeling, and information provided by Defendant in making purchasing decisions. By representing the Affected Product as containing only the ingredients listed on the Affected Product's labeling, and not disclosing the presence of the Heavy Metals, Defendant misled reasonable consumers, including Plaintiff and the Class.

51.    Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers and the general public, as they have already deceived and misled Plaintiff and the Class Members.

52.    In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay a premium for the Affected Product. Had Defendant not made the false, misleading, and deceptive representations and omissions, Plaintiff and the Class Members would not have been willing to pay the same amount for the Affected Product they purchased, and, consequently, Plaintiff and the Class Members would not have been willing to purchase the Affected Product.

53.    Plaintiff would not have purchased the Affected Product, or would have paid less for it, had the Affected Product been truthfully and accurately labeled.

## CLASS ALLEGATIONS

54.    Plaintiff brings his claims for relief pursuant to the Federal Rules of Civil Procedure 23(a), 23(b)(2), or 23(b)(3) on behalf of the following Class (collectively "the Class"):

> All consumers who purchased one or more of the Affected Product in the United States within the applicable limitations period (the "Nationwide Class").

55.    Plaintiff brings this class action individually and on behalf of the following California Subclass:

> All consumers who purchased one or more of the Affected Product in the state of California within the applicable limitations period (the "California Subclass").

56.    Excluded from the Class are governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, as well as any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

57.     The Nationwide Class and the California Subclass shall be referred to collectively throughout the Complaint as the Class.

58.     The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

59.     <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable. Plaintiff believes that there are thousands of consumers in the Class who are Class Members as described above who have been damaged by Defendant's deceptive and misleading practices.

60.     <u>Commonality</u>: The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

a.      Whether Defendant's marketing, advertising, packaging, and labeling for the Affected Product was false, misleading, and/or deceptive;

b.      Whether Defendant is responsible for the conduct alleged herein, which was uniformly directed at all consumers who purchased its Affected Product;

c.      Whether the Affected Product contains unsafe amounts of lead and cadmium;

d.      Whether Defendant breached the implied warranty of merchantability relating to the Affected Product;

e.      Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant has engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of its Affected Product;

      f.      Whether Defendant's false and misleading statements concerning its Affected Product were likely to deceive the public; and

      g.      Whether Plaintiff and the Class are entitled to money damages under the same causes of action as the other Class Members.

61.    <u>Typicality</u>: Plaintiff's claims are typical of the claims of the Class because Plaintiff, like all other Class Members, purchased the Affected Product, suffered damages as a result of that purchase, and seeks the same relief as the proposed Class Members.

62.    <u>Adequacy</u>: Plaintiff adequately represents the Class because their interests do not conflict with the interests of the members of the Class, and they have retained counsel competent and experienced in complex class action and consumer litigation. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the Class.

63.    <u>Predominance</u>: Pursuant to Rule 23(b)(3), the common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class. The Class issue fully predominates over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's deceptive and misleading marketing and labeling practices.

64.    <u>Superiority</u>: A class action is superior to other available means of adjudication for this controversy. It would be impracticable for members of the Class to individually litigate their own claims against Defendant because the damages suffered by Plaintiff and the members of the Class are relatively small compared to the cost of individually litigating their claims. Individual litigation would create the potential for inconsistent judgments, delay, and expenses to the court system. A class action provides an efficient means for adjudication with fewer management difficulties and comprehensive supervision by a single court.

65.     Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW
### CAL. BUS. & PROF. CODE §§ 17500, ET SEQ.
### (On behalf of Plaintiff and the California Subclass)

66.     Plaintiff and the Subclass incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

67.     Defendant's conduct as alleged herein violates California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, et seq., which makes it unlawful for a business to make, disseminate, or cause to be made or disseminated to the public "any statement, concerning…personal property…which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

68.     The Affected Product at issue is "personal property" within the meaning of the FAL.

69.     The Affected Product's packaging omitted any warnings or disclosures regarding the potential presence of foreign materials, contrary to reasonable consumer expectations.

70.     Any express or implied representation, material omission of information, or failure to correct a past material misrepresentation or omission regarding the safety of the Affected Product is a "statement[] concerning personal property" within the meaning of the FAL.

71.     Defendant violated the FAL by making, disseminating, and causing to be made or disseminated to the public statements about the safety of the Affected Product that were "untrue or misleading" within the meaning of the FAL.

72.     Defendant failed to disclose accurate information regarding the Affected Product generally. Defendant made, disseminated, or caused to be made or disseminated untrue or misleading public statements about the Affected Product in numerous forums, including but not limited to Defendant's website. Defendant falsely stated that there were robust, effective controls and testing to prevent post-processing contamination and that the Affected Product was safe for consumption, when in fact they omitted the known risk.

73.     Defendant knew, or by the exercise of reasonable care, should have known that each of those statements was untrue, misleading, and likely to deceive the public at or near the time it was made or disseminated, and at all times thereafter.

74.     Defendant's marketing materials fail to disclose details of the Affected Product and that its advertising communicated falsehoods, including that consumers would be safe.

75.     As a result of Defendant's FAL violations and the harm caused thereby, Plaintiff and Class members are entitled to and seek (a) injunctive relief to protect the consuming public by prohibiting Defendant from engaging in its past and ongoing acts, omissions, and conduct that violate the FAL; (b) restitution of the full value of all monies and other consideration that Plaintiff and Class members paid Defendant for the purchase of the Affected Product, including any reduced value of Plaintiff's and Class members' food, and disgorgement of the profits Defendant derived from its wrongful conduct; and (c) an award of reasonable attorneys' fees under Cal. Code Civ. Proc. § 1021.5.

**COUNT II**
**VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT**
**CAL. BUS. & PROF. CODE §§ 1750, ET SEQ.**
**(On behalf of Plaintiff and the California Subclass)**

76.     Plaintiff repeats, re-alleges, and incorporates each and every factual allegation contained in all previous paragraphs as if fully set forth herein.

77.     California's Consumer Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices" in connection with the sale or lease of goods. Cal. Civ. Code § 1770.

78.     The CLRA is to be liberally construed and applied to protect consumers against unfair and deceptive business practices. Cal. Civ. Code § 1760.

79.     Plaintiff, and each California Subclass member, is a "consumer," as defined in Cal. Civ. Code § 1761(d).

80.     The Affected Product is a "good[]," as defined in Cal. Civ. Code § 1761(a).

81.     Defendant is a "person" as defined in Cal. Civ. Code § 1761(c).

82.     Plaintiff and each proposed Subclass member's purchase of Defendant's Affected Product constituted a "transaction" as defined in Cal. Civ. Code § 1761(e).

83.     Defendant's actions were unfair, unlawful, and deceptive under the CLRA. Defendant made false representations about the Affected Product. Defendant falsely represented that the Affected Product met specific safety standards, while the Affected Product did not meet these standards and did not contain the advertised safety. Cal. Civ. Code § 1770(a)(7).

84.     Defendant's actions were unfair, unlawful, and deceptive under the CLRA as Defendant fraudulently advertised their Affected Product and fraudulently advertised that the Affected Product would contain certain qualities but sold consumers the Affected Product that was different than what was advertised. Cal. Civ. Code § 1770(a)(9).

85.     Defendant's actions were unfair, unlawful, and deceptive under the CLRA as Defendant promised that Plaintiff and the California Subclass Members that the Affected Product was safe. Cal. Civ. Code § 1770(a)(7).

86.     Defendant's actions were unfair, unlawful, and deceptive under the CLRA as Defendant inserted untrue statements about safety on its website. Cal. Civ. Code § 1770(a)(14).

87.     Defendant fraudulently deceived Plaintiff and the California Subclass by representing that their Affected Product and services have certain characteristics, benefits, and qualities, which they do not have. In doing so, Defendant intentionally misrepresented and concealed material facts from Plaintiff and the California Subclass. Defendant falsely advertised that its Affected Product had higher quality standards than those that were ultimately delivered. These misrepresentations and concealments were committed with the intention of deceiving Plaintiff and the California Subclass and depriving them of their legal rights and money.

88.     Defendant's claims about their products have led and continue to lead consumers to reasonably believe that Defendant's Affected Product was safe.

89.     Plaintiff and the California Subclass have suffered injury-in-fact as a result of and in reliance upon Defendant's false representations and have lost money as a result of Defendant's unfair, unlawful, and fraudulent conduct. Plaintiff and the California Subclass would not have bought Defendant's Affected Product, or would have paid significantly less for them, had they known that they would receive a product with lead in it.

90.     Defendant's actions as described herein were done with conscious disregard for Plaintiff and the rights of California Subclass Members, and Defendant intentionally represented that the Affected Product or services have approval, characteristics, ingredients, uses, benefits, or quantities which they do not have.

91.     Plaintiff and California Subclass Members seek all monetary and nonmonetary relief allowed by law, including restitution, reasonable attorneys' fees and costs under California Code of Civil Procedures § 1021.5, and injunctive relief under the CLRA pursuant to Cal. Civ. Code § 1782(d) and other appropriate equitable relief.

## COUNT III
## BREACH OF IMPLIED WARRANTY
### (On Behalf of Plaintiffs and All Class Members)

92.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

93.     Defendant manufactured, marketed, labeled, distributed, and sold the Affected Product, as part of its overall business.

94.     The Affected Product is considered a "good" under the relevant laws.

95.     For goods to be merchantable under U.C.C. § 2-314, they must (a) pass without objection in the trade under the contract description; (b) in the case of fungible goods, are of fair average quality within the description; (c) are fit for the ordinary purposes for which such goods are used; and (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved.

96.     Defendant breached the implied warranty of merchantability. The Affected Product, meant to be ingested, should not contain lead and cadmium, certainly not in amounts that are unhealthy or dangerous for consumers.

97.     Defendant is on notice of its breach. In addition to widespread media reports, upon information and belief and based on representations made by Huel, the Company is or should have been aware through its own product testing and records.

98.     The Affected Product contained lead and cadmium, in amounts that were dangerous or unhealthy to be consumed. Plaintiff and each of the members of the Class were injured as a

result. Defendant thereby breached the following state warranty laws: Alabama: Ala. Code § 7-2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Alaska: Alaska Stat. § 45.02.314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Arizona: Ariz. Rev. Stat. Ann. § 47-2314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Arkansas: Ark. Code Ann. § 4-2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); California: Cal. Com. Code § 2314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Colorado: Colo. Rev. Stat. § 4-2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Connecticut: Conn. Gen. Stat. § 42a-2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Delaware: 6 Del. C. § 2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Florida: Fla. Stat. § 672.314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Georgia: Ga. Code Ann. § 11-2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Hawaii: HRS § 490:2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Idaho: Idaho Code § 28-2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Illinois: 810 ILCS 5/2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Indiana: Burns Ind. Code Ann. § 26-1-2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Iowa: Iowa Code § 554.2314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Kansas: K. S. A. § 84-2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Kentucky: KRS § 355.2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Louisiana: La. C.C. Art. 2520, 2524 (2024) (warranty against redhibitory defects; thing fit for ordinary use); Maine: 11 M.R.S. § 2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Maryland: Md. Commercial Law Code Ann. § 2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Massachusetts: ALM GL ch. 106, § 2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Michigan: MCLS § 440.2314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Minnesota:

Minn. Stat. § 336.2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Mississippi: Miss. Code Ann. § 75-2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Missouri: § 400.2-314 R.S.Mo. (2024) (Implied Warranty: Merchantability; Usage of Trade); Montana: 30-2-314, MCA (2024) (Implied Warranty: Merchantability; Usage of Trade); Nebraska: R.R.S. Neb. (U.C.C.) § 2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Nevada: Nev. Rev. Stat. Ann. § 104.2314 (2024) (Implied Warranty: Merchantability; Usage of Trade); New Hampshire: RSA § 382-A:2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); New Jersey: N.J. Stat. § 12A:2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); New Mexico: N.M. Stat. Ann. § 55-2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); New York: NY CLS UCC § 2-314 (McKinney 2024) (Implied Warranty: Merchantability; Usage of Trade); North Carolina: N.C. Gen. Stat. § 25-2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); North Dakota: N.D. Cent. Code § 41-02-31 (2024) (Implied Warranty: Merchantability; Usage of Trade); Ohio: ORC Ann. § 1302.27 (2024) (Implied Warranty: Merchantability; Usage of Trade); Oklahoma: 12A Okl. St. § 2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Oregon: ORS § 72.3140 (2024) (Implied Warranty: Merchantability; Usage of Trade); Pennsylvania: 13 Pa. Cons. Stat. § 2314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Rhode Island: R.I. Gen. Laws § 6A-2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); South Carolina: S.C. Code Ann. § 36-2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); South Dakota: S.D. Codified Laws § 57A-2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Tennessee: Tenn. Code Ann. § 47-2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Texas: Tex. Bus. & Com. Code Ann. § 2.314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Utah: Utah Code Ann. § 70A-2-314 (2024) (Implied Warranty:

Merchantability; Usage of Trade); Vermont: 9A V.S.A. § 2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Virginia: Va. Code Ann. § 8.2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Washington: Rev. Code Wash. (ARCW) § 62A.2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); West Virginia: W. Va. Code § 46-2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Wisconsin: Wis. Stat. § 402.314 (2024) (Implied Warranty: Merchantability; Usage of Trade); Wyoming: Wyo. Stat. § 34.1-2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade); and District of Columbia: D.C. Code § 28:2-314 (2024) (Implied Warranty: Merchantability; Usage of Trade).

99.     As a direct and proximate result of Defendant's breach of the implied warranty, Plaintiff and Class Members were damaged in the amount of the price they paid for the Affected Product.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

100.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

101.     Defendant knowingly accepted and retained the monetary benefits flowing from these transactions, including revenue, market share, and brand goodwill, all of which were obtained at Plaintiff's and the Class's expense.

102.     Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class against Defendant.

103.     Plaintiff and members of the Class conferred benefits on Defendant by purchasing the Affected Product.

104.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class members' purchases of the Affected Product.

105.    Defendant appreciated and accepted these benefits under circumstances where Defendant was aware, or should have been aware, that its representations about the Affected Product's contents and safety were misleading.

106.    Retention of those monies under these circumstances is unjust and inequitable because Defendant has engaged, and continues to engage, in a systematic campaign representing that the Affected Product does not contain the Heavy Metals, concealing and omitting material facts regarding the true nature of the Affected Product. Plaintiff and Class Members lacked adequate information or alternative means to learn the material facts regarding the presence of Heavy Metals and reasonably relied on Defendant's marketing and labeling. These false representations and omissions caused injuries to Plaintiff and members of the Class because they would not have purchased the Affected Product, if at all, if they knew that the Affected Product contained lead and cadmium.

107.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and members of the Class is unjust and inequitable, Defendant must disgorge and pay restitution or, alternatively, the imposition of a constructive trust over monies wrongfully obtained from Plaintiff and the Class.

## COUNT V
**VIOLATIONS OF NEW YORK CLS GEN BUS § 349**
**(On Behalf of Plaintiff and the Class)**

108.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

109.    By the acts and conduct alleged herein, Defendant committed deceptive acts and practices in the State of New York by making the above alleged misrepresentations directed to consumers in New York.

110.    Plaintiff and other members of the Class are "consumers" in accordance with New York General Business Law, NY CLS Gen Bus § 349 ("GBL").

111.    By the acts and conduct alleged herein, Defendant engaged in deceptive, unfair, and misleading acts and practices, which include, without limitation: (1) failing to warn or disclose to purchasers of the Affected Product containing unsafe levels of Heavy Metals for consumption; (2) advertising that the Affected Product was safe for use; and (3) failing to warn in the product page about the material risk that the Affected Product contained unsafe levels of Heavy Metals.

112.    Defendant concealed and omitted material facts regarding the true nature of the Affected Product.

113.    A reasonable consumer would have considered that information important in deciding whether to purchase the Affected Product.

114.    The foregoing deceptive acts and practices were directed at consumers.

115.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

116.    Defendant possessed information about the Affected Product, including, but not limited to, the fact that the Affected Product contained unsafe levels of Heavy Metals, which was relevant to Plaintiff and Class members, but failed to disclose this information.

117.    By reason of this conduct, Defendant engaged in deceptive conduct in violation of New York's General Business Law.

118.    Defendant's statements concerning the safety of the Affected Product, alleged above, were misleading in violation of NY CLS Gen Bus § 349. At all relevant times, Defendant conducted trade and commerce in New York and elsewhere within the meaning of § 349 and profited from the sale of the Affected Product within New York.

119.    On behalf of himself and other members of the Class, Plaintiff brings this action to enjoin Defendant's unlawful and deceptive acts or practices and seek to recover his actual damages or fifty dollars, whichever is greater, per violation, three times actual damages, and reasonable attorneys' fees.

120.    As a direct and proximate result of Defendant's conduct, Plaintiff and other members of the Class have suffered damages.

121.    Accordingly, Plaintiff and the Class seek to enjoin the unlawful acts and practices described herein, to recover actual damages or statutory damages of fifty dollars and five hundred dollars under NY CLS Gen Bus § 349, whichever is greater, as well as punitive damages and reasonable attorneys' fees and costs. On behalf of Plaintiff and the Class, Plaintiff also seeks an order entitling him and the Class to recover all monies which were acquired through Defendant's acts of fraudulent, unfair, or unlawful competition.

## <u>COUNT VI</u>
## VIOLATIONS OF NEW YORK CLS GEN BUS § 350
### (On Behalf of Plaintiff and the Class)

122.    Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

123.    By the acts and conduct alleged herein, Defendant committed deceptive acts and practices in the State of New York by making the above alleged misrepresentations directed to consumers in New York.

124.    Plaintiff and other members of the New York Class are "consumers" in accordance with NY CLS Gen Bus § 350.

125.    New York's General Business Law, NY CLS Gen Bus § 350, prohibits false advertising in the conduct of any business, trade, or commerce.

126. Pursuant to said statute, false advertising is defined as "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect."

127. Based on the foregoing, Defendant engaged in consumer-oriented conduct that is deceptive or misleading in a material way, which constitutes false advertising in violation of Section 350 of New York's General Business Law.

128. Defendant's false, misleading, and deceptive representations and omissions of fact about the Affected Product were and are directed towards consumers.

129. Defendant's false, misleading, and deceptive representations and omissions were material and are likely to mislead a reasonable consumer acting reasonably under the customary or usual circumstances.

130. Defendant's false, misleading, and deceptive representations and omissions have resulted in consumer injury or harm to the public interest.

131. As a result of Defendant's false, misleading, and deceptive statements and representations of fact, and omissions, Plaintiff and the Class have suffered and continue to suffer economic injury.

132. As a result of Defendant's violations, Plaintiff and members of the Class have suffered damages because: (a) they would not have purchased the Affected Product on the same terms, if at all, if they knew that the Affected Product has unsafe quantities of Heavy Metals; and (b) the Affected Product does not have the characteristics, uses, benefits, or qualities as promised.

133. On behalf of himself and other members of the Class, Plaintiff seeks to recover actual damages or five hundred dollars, whichever is greater, for each violation, three times actual damages, and reasonable attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all other similarly situated, seeks judgment against the Defendant as follows:

a. For an order determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

b. For an order declaring the Defendant's conduct violates the laws referenced herein;

c. For a declaration that Defendant's conduct, representations, and omissions violate the statutes and common law cited herein;

d. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

e. For damages in amounts to be determined by the Court and/or jury;

f. An award of statutory damages or penalties to the extent available;

g. For pre-judgment interest on all amounts awarded;

h. For injunctive, declaratory, and any other relief the Court deems just and proper;

i. For an order of restitution and all other forms of monetary relief; and

j. Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 23, 2025

**LEVI & KORSINSKY, LLP**

By: */s/ Mark S. Reich*
Mark S. Reich (511263)
Michael Pollack (6173272)
33 Whitehall, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: mpollack@zlk.com

*Attorneys for Plaintiff*